John H. Gomez (CA Bar No. 171485)
Joshua R. Harris (FL Bar No. 124124) *pro hac vice forthcoming*
**GOMEZ TRIAL ATTORNEYS**
755 Front Street, San Diego, CA 92101
Ph: 619-237-3490 / Fax: 619-237-3496
john@getgomez.com
josh@getgomez.com

Galen M. Hair (LA Bar No. 32865) *pro hac vice forthcoming*
Kyle C. Usner (LA Bar No. 38923) *pro hac vice forthcoming*
**HAIR SHUNNARAH TRIAL ATTORNEYS**
3001 17th Street, Metairie, LA 70002
Ph: 504-684-5200 / Fax: 504-613-6351
hair@hstalaw.com
kusner@hstalaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **CHARLES JOHNSON** as Guardian ad Litem and on behalf of **C.J.**, a minor,<br><br>    Plaintiff,<br><br>    vs.<br><br>**ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB.**, and **JOHN DOES 1-50**<br><br>    Defendants. | Case No.:    3:25-cv-10314<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Strict Product Liability – Design Defect**<br>2. **Strict Product Liability – Failure to Warn**<br>3. **Negligence – Design**<br>4. **Negligence – Failure to Warn**<br>5. **Common Law Negligence**<br>6. **Statutory Negligence**<br>7. **Intentional Misrepresentation**<br>8. **Negligent Misrepresentation**<br>9. **Fraud**<br>10. **Violations of California's Unfair Competition Law**<br>11. **Strict Product Liability – Design Defect**<br>12. **Strict Product Liability – Failure to Warn**<br>13. **Negligence – Design**<br>14. **Negligence – Failure to Warn**<br>15. **Negligence**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff C.J., a minor, via their Guardian ad Litem Charles Johnson, hereby brings this action against the above-captioned Defendants , Roblox Corporation, Epic Games, Inc., Microsoft Corporation, Mojang AB, and DOES 1-50, to recover damages arising from the severe injuries sustained because of C.J.'s use of and addiction caused by Defendants' video game Product. In support thereof, Plaintiff alleges and states:

**INTRODUCTION**

1.      Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games. Rather, this litigation seeks to hold each Defendant accountable for failing to warn and failing to include available safeguards against the known risks to minors associated with excessive use of its video game Product and choosing instead to implement programming that exacerbated these risks to increase its profits.

2.      Each Defendant is aware that the more time an individual spends playing their respective games and on their platforms, the higher the likelihood that said individuals will make in-game purchases, thereby increasing each Defendant's revenue.

3.      Each Defendant is also aware that for more than four decades, scientists have known about and studied video game addiction.[1] Furthermore, each Defendant is aware that for nearly two decades, science has shown that prolonged use of video games by minors can result in detrimental impacts on brain function, cognitive decline, and physical and emotional deficits.

4.      Despite being fully aware of these risks, Defendants marketed their respective games, Roblox, Fortnite, and Minecraft, and Xbox video game platform[2], (collectively "Products"), to minors without implementing simple safety features, such as adequate parental controls, warnings, or opt-in limits on the time minors can spend in-game.

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

[2] Hereinafter, "Xbox platform" collectively refers to all Xbox consoles (including Xbox 360, Xbox One, Xbox One S, and Xbox One X) and Xbox online game platforms (including the Xbox Network, Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming).

5.    Instead, each Defendant chose to add features to their Products that they knew would be addictive to minors in order to maximize time spent in their respective game and on its platform, thus improving the odds of minors making in-game purchases, and thereby increasing each Defendant's profits. Rather than taking necessary steps to mitigate the known risks associated with prolonged exposure of minors to video games, each Defendant intensified the problem by causing and profiting from youth addiction.[3]

6.    Defendants' strategies have been extremely lucrative. As a result of each Defendant's inclusion of addictive features in their Product, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis for minors suffering from addiction to and disordered use of video games.

7.    While there are countless video games on the market, many with similar game design and warning defects described herein, Defendants and their respective games, Roblox, Fortnite, and Minecraft, have unique impacts on minors. As explained below, each Defendant's marketing strategies specifically target youth, such as Plaintiff C.J. Accordingly, Defendants' games – Roblox, Fortnite, and Minecraft – are often among the first online video games children play and the catalyst to an addiction cycle and disordered relationship with video games.

8.    Defendant Microsoft's Xbox video game platform is often where these games are played. As described herein, Defendant Microsoft designed its Xbox platform with game-like features that caused and further exacerbated addiction and disordered relationships with video games.

9.    As set forth below, because of Defendant's marketing efforts, Roblox, Fortnite, and Minecraft were among the first online video games played by Plaintiff C.J. Plaintiff C.J. played

---

[3] Addiction, as defined in the seminal article *Addictive behaviors: Etiology and Treatment,* published by the American Psychological Association in its 1988 *Annual Review of Psychology*, is:

"a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate."

these games on Microsoft's Xbox platform. As each Defendant expected and intended from its decision to add addictive and manipulative programming to its Product instead of safety features, Plaintiff C.J. developed a disordered relationship with and became addicted to video games as a result of playing Roblox, Fortnite, and Minecraft. As a result, Plaintiff C.J. suffers from severe physical, emotional, and economic injuries, including diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts due to their gaming addiction. Through this lawsuit, C.J. seeks to hold each Defendant accountable for their respective decisions to place profits over safety, which directly and proximately resulted in Plaintiff C.J.'s significant harm.

10.    The true names and capacities of the Defendants, DOES 1-50, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiffs are informed and believe and thereon allege that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damages as alleged and set forth herein were a substantial factor by such fictitiously named Defendants.

## PARTIES

### I.    Plaintiff's Guardian Charles Johnson

11.    Plaintiff's guardian Charles Johnson is, and at all times relevant to this action was, a citizen and resident of the State of New Jersey whose principal place of residence is Camden County.

12.    Plaintiff Charles Johnson is the father of C.J., and he serves as C.J.'s Guardian ad Litem and representative in this lawsuit. Plaintiff Charles Johnson is not pursuing any claims in his individual capacity.

### II.    Plaintiff C.J.

13.    Plaintiff C.J., a minor, is, and at all times relevant to this action was, a citizen and resident of the State of New Jersey with a principal place of residence located in Camden County. Plaintiff C.J. is thirteen years old at the time of filing this lawsuit.

14. Plaintiff C.J. began playing video games at approximately six years old. Since that time, Plaintiff C.J. has used and/or continues to use video games at an increasing, uncontrollable, compulsive, and/or addictive pace. This addiction began with Plaintiff C.J.'s use of Defendants' respective Products. Plaintiff C.J. has been injured and damaged, and continues to be injured and damaged, as a result of Plaintiff C.J.'s video game addiction caused Defendants' defective Products.

**III.  Defendant Roblox Corporation**

15. Defendant Roblox Corporation ("Roblox Corp.") is a Nevada corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

16. Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed and/or supplied Roblox, either directly or indirectly, to members of the general public, including to New Jersey residents and Plaintiff C.J.

17. Roblox Corp. performs the majority of its development, sales, executive, and other essential business functions from its primary office in San Mateo, California. Roblox has maintained significant contacts with the state of California since its conception, including maintaining its headquarters in California since 2006.

**IV.  Defendant Epic Games, Inc.**

18. Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

19. Epic Games is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public, including to New Jersey residents and Plaintiff C.J.

20. Epic Games is a foreign business corporation actively registered to do business in the state of California.

**V.  Defendant Microsoft Corporation**

21.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

22.     Microsoft is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public, including to New Jersey residents and Plaintiff C.J.

23.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Platform – on which Roblox, Fortnite, and Minecraft could be played – to members of the general public within California, including to Plaintiff C.J.

24.     Microsoft is a foreign business corporation actively registered to do business in the state of California.

## VI.     Defendant Mojang AB

25.     Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

26.      Mojang is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public, including to New Jersey residents and Plaintiff C.J.

27.     In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly-owned subsidiary of Defendant Microsoft.

28.     Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing, assembly, manufacturing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale the Minecraft video game series that

Plaintiff C.J. began playing. Indeed, both Mojang and Microsoft are responsible for the addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

**JURISDICTION AND VENUE**

29.     This suit alleges causes of action seeking relief arising under the laws of California, including but not limited to the allegation that as a direct and proximate result of Defendants' respective Products and each Defendant's negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations, and misrepresentations, including by omission, Plaintiff C.J. suffered and continues to suffer injuries and damages.

30.     This Court has subject-matter jurisdiction over this action under 28 U.S.C.S. § 1332(a) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

31.     This Court has general personal jurisdiction over Defendant Roblox Corp. because Roblox Corp. has its principal place of business in this District and because its continuous contact with this District renders it "at home" in this District. Defendant Roblox Corp. maintains its principal place of business in the County of San Mateo.

32.     This Court has specific personal jurisdiction over Defendants Epic Games, Microsoft, and Mojang because they are corporations and/or entities that are foreign, nonresidents of the state of California that have sufficient minimum contacts in, to, and with California arising from activities whereby they have purposefully and intentionally availed themselves to the benefits and protections of the laws of the state of California, and the market of the state of California, and continue to date to avail themselves in that manner, and with respect thereto, the controversy reflected in this action is directly affiliated with, related to, and arises from Defendants' contacts with the state of California, such that the exercise of jurisdiction over each Defendant by this Court is consistent with traditional notions of fair play and substantial justice and is not only not unreasonable, would be and is both reasonable and proper.

33.     Venue is proper in this Court under 28 U.S.C.S. § 1391 because Defendant Roblox Corp resides and has its principal place of business in this District, and a substantial part of the events and omissions giving rise to Plaintiff C.J.'s claims occurred in this District.

### GENERAL FACTUAL ALLEGATIONS

34.     In 2023, 65% of Americans of all ages played video games every week.[4] In 2024, experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and 73% of girls reporting video game usage.[5] Further, more than 90% of children older than two years old play video games, and "[c]hildren 8 to 17 years of age spend an average of 1.5 to 2 hours daily playing video games."[6] This research dramatically emphasizes the idea that video game usage has become fundamental in the life of an American child.

### I.    Extensive Video Game Usage Damages Adolescent Brains

35.     For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the addiction to video gaming.

36.     One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

37.     Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including

---

[4] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023), https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.

[5] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.

[6] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

38.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

39.    Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

40.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

41.    Research has shown that prolonged use of video games damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

42.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with

substance abuse and addiction, such as hangovers, changes in mood, inability to adapt, withdrawal, conflict, and recurrence symptoms.

43.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.

44.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

45.    Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

46.    During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

47.    Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of



COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[7]

48.     Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

49.     Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:[8]



50.     Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) may arise because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

51.     Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing

[7] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).
[8] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[9] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when the video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

## II.    Gaming Addiction Is a Recognized and Diagnosable Condition

52.    Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[10] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

---

[9] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).
[10] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

53.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[11]

54.    As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[12] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

### III.    Historical Development and Modernization of Video Games

55.    Video games were first developed in or around the 1950s.

56.    Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

57.    By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

58.    Many video games – including Roblox, Fortnite, and Minecraft – can now be played on multiple different consoles, mobile devices, and tablets.

---

[11] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[12] Other disorders found in that subcategory include alcoholism and gambling addiction.

59.     Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, online gaming networks, and cloud gaming services.

60.     In 2024, there were 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[13]

61.     As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

62.     Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

63.     The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

64.     In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

65.     Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

66.     In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

67.     Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

---

[13] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

68.     For game developers that offer their games at no or low cost, such as Roblox, Fortnite, and Minecraft, microtransactions are vital for generating profits. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

69.     Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of time spent in game, at times providing features that encourage the player to reach a flow state of continuous gameplay, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

## IV.    Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits

### A.    Operant Conditioning

70.     Modern game developers, including Defendant, employ(ed) and/or consult(ed) child development experts and/or psychologists to assist with the design and development of their games and/or gaming platforms, and to analyze the effects of game design on user behavior.

71.     Upon information and belief, modern game developers, including Defendants, knew that minors were engaging with their Products and utilized their child development experts and/or psychologists to design its game to attract and addict minors to their Products.

72.     Upon information and belief, the analyses performed by each Defendant's behavioral experts and/or psychologists revealed that when video games that are programmed to incorporate "operant conditioning" that targets users' dopamine receptors, the operant conditioning triggers users' desire to hyperfocus on using and overusing the Product.

73.     "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

- 15 -

74.     In the context of video games and gaming platforms, video game developers, including Defendants, relied upon these psychological analyses to program their games and platforms to employ operant conditioning in order to addict players and manipulate them into making profitable decisions for the game developers, such as spending more time playing their respective games and engaging in microtransactions.

**B.     Development and Use of Patented Programming**

75.     In addition to relying on their own studies to make programming decisions, game developers, including Defendants, helped develop, licensed, and otherwise utilized patented programming algorithms in their games and gaming platforms that were intended to addict players, increase time spent in-game, and drive microtransactions. By way of example:

a.   U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendant's at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match[] to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions is comprised of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the

relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

b.  U.S. Patent No. 9623335-B1 utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game," such as a virtual shop "present[ing] high-end, or expensive virtual items." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

c.  U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

d.  U.S. Patent No. 9795886-B1 allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

e.  U.S. Patent No. 9403093-B2 is a "dynamic" pricing patent that encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating to play the game."

f.  U.S. Patent No. 9626475-B1 creates an exclusive, time-limited, event-based

currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

g. U.S. Patent No. 9666026-B1 provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the first offer."

h. U.S. Patent No. 9808708-B1 adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

76.    Upon information and belief, many game developers, including Defendant, license one or more of the above technology patents, and/or other patents similar thereto, and incorporate said technology into their Products with the intention of creating addiction and profits.

**C.    Operant Conditioning, Patented Technology, and Game Design Choices Increase Time Spent In-Game and Revenue Generated by Microtransactions**

77.    Using operant conditioning and patented technology, video game developers, including Defendant, use algorithms to analyze the behavior of the user and customize their experience, or guide the user to reach a flow state while playing, to maximize the time spent in-game, during which the user is bombarded with solicitations to purchase additional in-game downloadable game content.

78.    In so doing, video game developers, including Defendants, exploit an information asymmetry between themselves and the user. This allows game developers, including the Defendants, to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize a user's expenditure of real money.

79.    For example, in some instances, video games, including Defendants, include a feature that increases the difficulty of the game as the player's skill increases, thereby increasing the amount of time it takes for the player to achieve repeated success. During the extra time it now takes for the player to achieve success, the player is exposed to repetitive advertisements for desirable in-game items that can be obtained through points earned over time through continued and prolonged gameplay or instantaneously using in-game or real-world currency.

80.    Likewise, game developers, including Defendants, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Game developers incentivize players that have purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. Once again, however, by design game difficulty is dynamic, resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

81.    Critical to Defendant's revenue, such continued features with little to no restriction on the amount of spending in the payment interface also makes it easy for minor users to fail to understand the value of the actual money being spent, which allows for more easeful and continuous spending of real money.

82.    These and other features—which the Defendants knowingly incorporates into the design aspects of their Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users (especially minors who are vulnerable to these tactics) and which serve to deepen their disordered or addicted use.

**V.    Addictive Game Design Features Cause Significant Harm to Minors**

83.    The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors; minors who are neurodivergent are even more susceptible to becoming addicted. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games and platforms to exploit that vulnerable population, causing injury and detriment, including to Plaintiff C.J. Doing so has yielded the intended results: video game developers, including

Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive Products that are targeted to minors into the stream of commerce.

84.     Each Defendant knew or was aware, or should have known and should have been aware, that its Product was dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed its Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer and longer periods of time.

85.     The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into its Products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the Products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

86.     There is no disclosure of the addictive mechanisms designed as a part of Defendant's Products at the time it is downloaded to allow prospective users to make informed decisions as to whether using the Products is desirable, appropriate, safe, or worth the potential risk.

87.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff C.J. herein, to use its Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

88.     Each Defendant, with knowledge of C.J.'s age and residency, targeted Plaintiff C.J. with manipulative programming to prolong use of their Products in hopes of inducing Plaintiff C.J. to engage in microtransactions during their use of the Products. As a result of Plaintiff C.J.'s use of

each Defendant's Products, and because of the addictive design features incorporated into the Products, Plaintiff C.J. was injured and damaged as herein alleged.

**VI.    Roblox**

  **A.    <u>Roblox Gameplay Basics</u>**

  89. Roblox is a video game and platform that was developed and published by Roblox Corp. The game was released in September 2006.

  90. At present, Roblox has approximately 111.8 million daily active users.[14]

  91. More than 45% of the consumers playing Roblox are under age 13.[15]

  92. Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

  93. Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

  94. Individuals that wish to play Roblox must create a Roblox account.

  95. In order to create a Roblox account, individuals must include a birthdate, username, and password.

  96. Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

  97. Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

  98. After creating an account, all users are assigned a default player avatar – a cartoonish character that represents the individual user within certain games. This avatar can be customized with different outfits and appearances through in-game purchases made in the in-game Roblox store using in-game currency known as Robux.

---

[14] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 3, 2025).
[15] *The Roblox User Base,* Roblox Creator Hub, https://create.roblox.com/docs/production/roblox-user-base (last visited July 24, 2025 ).

99.    Robux can be obtained by (a) purchasing it with real currency; (b) receiving a recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox players.

100.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

101.    Roblox has hosted over 3.7 billion virtual transactions on its platform.[16]

102.    Roblox Corp. offers a Premium Membership option to users, which can be purchased with Robux. A Premium Membership offers users exclusive items and discounts, Premium-only levels within certain games, the ability to trade items with other users, and a stipend of Robux that defrays the purchase cost of the Premium Membership.

103.    Roblox gameplay is unique and different from many "traditional" games. When an individual "plays" Roblox, they open the Roblox program, where they are presented with a myriad of games (known as "experiences") they can play.

104.    Roblox Corp. groups each "experience" into four content-based categories: Minimal, Mild, Moderate, and Restricted. Once the user creates an account, the user can access almost all of Roblox's content if they represent they are over 8 years old. If a user is under 9 years old, they are only able to view Minimal and Mild content. If the user indicates they are between the ages of 9 and 17, the only content not accessible is content specifically marked as "Restricted," which requires ID verification to view.

105.    These "experiences" or games available on Roblox are further sorted into different genres/categories, including but not limited to: Sports, Role-Playing Games (RPG), Fighting, First Person Shooters (FPS), Horror, Comedy, Military, and Naval.

106.    The games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the user.

107.    While within the Roblox platform, players can jump back and forth between the games Roblox presents to each player.

---

[16] *Earning on Roblox*, Roblox Creator Hub, https://create.roblox.com/docs/production/earning-on-roblox (last visited Aug. 23, 2024).

108.    Most games available on the Roblox platform were not directly made by Roblox Corp. Rather, the Roblox platform includes a game design feature, as detailed below, whereby Roblox teaches users and provides tools for users to generate their own games and make them available on the Roblox platform for others to play.

**B.    Roblox Corp.'s 2024 and 2025 Changes to Safety Settings**

109.    In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls."[17] It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox."[18]

110.    The changes Roblox Corp. made in 2024 included new labels for categories of content, changes to viewable content for each age group, parental controls for minors' screen time usage, and a new minimum age at sign up.

111.    In April of 2025, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users."[19] These 2025 updates included the ability for guardians to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Guardians can now also block specific games and experiences for their minors.

112.    Prior to the 2024 changes, Roblox Corp. allowed all users, regardless of age, to view any content other than that marked "17+." In fact, users as young as 2 or 3 could view any content on the platform that was not protected by age verification. Beginning in 2024, Roblox Corp. imposed stricter limits on the content viewable to users that represent they are younger than 9 years old. Even after these changes, however, users that represent they are older than 8 can still access all content not marked as "17+".[20]

113.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time

---

[17] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Nov. 25, 2024).
[18] *Id.*
[19] Matt Kaufman, *New Tools for Parents to Personalize Their Child's Experience on Roblox*, Roblox Newsroom, https://corp.roblox.com/newsroom/2025/04/new-parental-controls-on-roblox (last visited Apr. 7, 2025).
[20] "17+" content is now known as "Restricted" content on Roblox.

and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

114.    Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account.[21] Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

115.    Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

116.    The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in general. These changes also demonstrate that Roblox Corp. has control over access to not only its platform, but the games users are able to access on its platform. The changes that Roblox Corp. implemented in 2024 and in 2025 did not require game by game review by Roblox Corp., but instead were implemented as system-wide updates.

117.    Roblox Corp. admits in publicly filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental consent requirements, and certain other regional requirements."[22]

---

[21] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Apr. 8, 2025).
[22] Roblox Corporation, Form 10-K (Feb. 18, 2025), p. 14 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000033/rblx-20241231.htm). *See e.g.*, Roblox Corporation, Form 10-K (Feb. 25, 2022), p. 15 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509822000058/rblx-20211231.htm); Roblox Corporation, Form 10-K (Feb. 28, 2023), p. 14 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509823000035/rblx-

118.     Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.[23]

**C.     Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

119.     Roblox Corp. does not inform users of the inherent risks involved with using and playing Roblox, specifically excluding that Roblox was designed to addict users to their extreme harm and detriment.

120.     Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[24] For example, Roblox Corp. states that:

    a.  it has "built a platform with safety at the foundation."[25]

    b.  it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."[26]

    c.  users should "learn about how Roblox's commitment to safety and civility helps students grow."[27]

    d.  it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users."[28]

20221231.htm); Roblox Corporation, Form 10-K (Feb. 21, 2024), p. 15 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509824000026/rblx-20231231.htm).

[23] See Roblox Corporation, Form 10-Q (May 1, 2025), p. 68 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-20250331.htm ("…[R]equirements for verified parental consent before allowing children to create an account may limit the use of our Platform or reduce our overall demand for our Platform, which would harm our business, financial conditions, and results of operations").

[24] Matt Kaufman, CFO, *Driving Civility and Safety for All Users,* https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Apr. 8, 2025).

[25] *Id.*

[26] *Id.*

[27] *Education*, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).

[28] Naren Koneru, Eleonore Vonck, *Open Sourcing Roblox Sentinel: Our Approach to Preemptive Risk Detection* (Aug. 7, 2025), https://corp.roblox.com/newsroom/2025/08/open-sourcing-roblox-sentinel-preemptive-risk-detection.

e.  its age recommendations for its Product are "grounded in child development research and informed by industry standards," essentially confirming its reliance on scientific research about adolescent development and content consumption.[29]

f.  its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts"[30]; and

g.  its Product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its Product is safe for use of all ages.[31]

121.    While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

122.    None of Roblox's parental controls (aside from content restrictions) are automatically applied or required when a minor creates an account. A minor can easily create an account and bypass any parental controls if their guardian is unaware of the account or the ability to enable parental controls.

123.    Roblox Corp. states on its website that[32]:

**▼ First, get the go-ahead**

If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

124.    Despite its acknowledgement that users under 13 should not "use [its] services without their [guardian's] go-ahead," Roblox Corp. provides absolutely no safeguards or requirement of parental consent when making an account, even if that user represents they are under the age of 13. Further, this instruction regarding parental permission does not reasonably coexist with Roblox

---

[29] Allowed Experience Controls, Roblox, httpbuildps://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Apr. 8, 2025).

[30] *Content Maturity Labels*, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Apr. 8, 2025).

[31] *Education*, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).

[32] *Roblox Privacy and Cookie Policy*, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited July 24, 2025).

Corp.'s acknowledgement that its game was created for children.

125.    Roblox Corp. could, but chooses not to, require express parental consent for minors under 13 to create an account. Despite its acknowledgement that minors should get permission from guardians before using its Product, Roblox Corp. fails to require parental consent.

126.    Additionally, Roblox Corp. only allows a parent to enable parental controls through their minor's account or a linked account. To engage with/change any parental control settings or link a minor's account to theirs, the parent must first know that the account exists, and subsequently know the log in information of their minor, or the minor must enter the parent's email address into their Roblox account.[33]

127.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account.

128.    Further, once a user reaches the age of 13, parents can no longer impose parental controls on their minor's account.[34]

129.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

130.    The only Roblox content that is restricted by ID verification is "Restricted content." Though Roblox Corp. has imposed content limits on users under the age of 9, a minor under the age of 9 could easily create an account with a fictitious birth date representing they are over 8 and access most of Roblox's games. Without age verification at account creation and/or to view specific content, a minor under 9 can easily bypass Roblox's restrictions.

131.    At account setup, Roblox's website contains no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from

[33] *Parents: How to Link Your Child's Account*, Roblox, https://en.help.roblox.com/hc/en-us/articles/30428321333140-Parents-How-to-Link-Your-Child-s-Account (last visited July 24, 2025).
[34] *What Happens As I Get Older On Roblox?*, Roblox Support, https://en.help.roblox.com/hc/en-us/articles/30428367965460-What-happens-as-I-get-older-on-Roblox#:~:text=In%20most%20regions%2C%20after%20a,limits%20will%20no%20longer%20apply. (last visited July 24, 2025).

the excessive use of Roblox Corp.'s Product. Users are not provided with information regarding potential physical and mental harm associated with compulsive gameplay.

132.    During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Roblox Corp.'s Product. Users are not provided with information regarding potential physical and mental harm associated with compulsive gameplay.

133.    Roblox Corp., while touting safety as a core value of its company, chooses not to implement meaningful safety features, understanding that changes in parental controls and safety features will reduce time spent in game and, ultimately, revenue.

**D.    Roblox Corp.'s Monetization of Intentionally Addictive Game Design**

134.    Roblox Corp. designed the game-creation aspect of its Product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors. Though third parties create the games, Roblox Corp. profits from all monetary transactions that occur within these third-party created games.

135.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

136.    Users that create their own games are referred to as "Creators" or "Developers."

137.    Roblox Corp.'s website boasts that its top ten Developers made, on average, $33.9 million in 2024.[35]

138.    Roblox Corp. reports its Developers have been collectively paid $3.3 billion since 2018.[36]

139.    Roblox Corp. encourages creators to incorporate into games the tools that Roblox Corp. created, and makes available within Roblox's game design studio. To assist in teaching

[35] *Earn on Roblox,* Roblox Creator Hub, https://create.roblox.com/docs/production/earn-on-roblox (last visited July 24, 2025).
[36] *Id.*

current and potential Developers how to utilize Roblox's tools and Roblox Studio, the Roblox Corp.'s Creator Hub includes literature under topics such as: "Publishing," "Promotion," and "Monetization." The Creator Hub's purpose is to teach potential creators "everything [they] need to know about creating on Roblox."[37]

140.    The "Monetization" topic on the Creator Hub includes literature on monetization strategies, immersive ads, subscriptions, passes, developer Products, avatar items, engagement-based payouts, paid access, and private servers.[38]

141.    The Creator Hub discusses "Engagement-Based Payouts," which lets the Developer "earn Robux based on the share of time that Premium members engage in an experience."[39]

142.    Roblox Corp.'s Creator Hub encourages Developers to keep users playing their game(s) for as long as possible to increase the Developer's profits, and in turn, Roblox Corp.'s.

143.    The Creator Hub provides instructions on how Developers can access their "payout data," which will help the Developer "understand what factors drive Premium subscribers to [their] experiences."[40] Analytics on the website provide data and insight to grow a Developer's audience.[41]

144.    One of the tools Roblox Corp. created and is featured on Roblox's Creator Hub is a "season pass." As described above, a season pass allows players to pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Compl. ¶ 66. Roblox Corp.'s Creator Hub encourages the use of season passes to motivate players to continue playing Developers' games, create a sense of urgency regarding items offered for the season, and create anticipation for the next season to keep players coming back.[42]

---

[37] *Creation Overview*, Roblox Creator Hub, https://create.roblox.com/docs/creation (last visited July 24, 2025).
[38] *Monetization*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization (last visited July 24, 2025).
[39] *Engagement-Based Payouts*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization/engagement-based-payouts (last visited July 24, 2025).
[40] *Id.*
[41] Roblox Creator Hub, https://create.roblox.com/ (last visited July 24, 2025).
[42] *Season Pass Design*, Roblox Creator Hub. https://create.roblox.com/docs/production/game-design/season-pass-design (last visited July 24, 2025).

145.    Roblox Corp. therefore encourages and gives step-by-step instructions for Developers to incorporate Roblox's harmful and addictive algorithms, programming, and strategies, including microtransactions and features without warnings or time restrictions, as described hereafter, into each of their games resulting in Roblox Corp. earning significant profits from each game it helped design, host, and promote on its platform.

146.    Beyond working with Developer to create additive games, Roblox Corp. purposefully designed other features within its Product to intentionally addict users.

147.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

148.    Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors. Nonetheless, Roblox Corp. chose to not inform the consuming public at large, users, or guardians of minors who are users, of such risks.

149.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

150.    Roblox Corp. admits to consulting child development experts for aspects of game development:[43]

> **How is an Age Recommendation determined?**
>
> Roblox's age recommendations are grounded in child development research and informed by industry standards. To determine which audiences an experience is generally suitable for, we examined global industry standards and consulted child development experts.

151.    Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[44]

152.    The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff C.J., suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## VII.    Fortnite

### A.    Fortnite Gameplay Basics

153.    Fortnite is an online video game and game platform designed, developed, and published by Epic Games.

---

[43] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Aug. 28, 2024).
[44] *See, e.g.*, Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited July 24, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited July 24, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited July 24, 2025).

154.    Fortnite is free to play, making it easily accessible to all users, including minors.

155.    Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

156.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[45]

157.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

158.    Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

159.    Each of Epic Games's herein listed Fortnite Products has similar graphics, art assets, and game mechanics.

160.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.[46]

---

[45] The Week Staff, *What is Fortnite and Why is it So Popular?*, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

[46] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

161.    Less than two years after Fortnite's release, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.[47]

162.    Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

163.    Fortnite includes a feature called a "Battle Pass," which is identical to the "season pass" feature described above. Compl. ¶ 85. The Battle Pass in Fortnite allows players to earn various rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[48] The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic Games through the purchase of in-game content.

**B.    Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase Profits**

164.    Fortnite's Battle Royale and Save the World are rated T for Teen, *i.e.,* recommended for individuals aged 13 and above. This does not mean younger children cannot play these games or that Epic Games does not know that children under 13 are using Fortnite Products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to minors.

165.    Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[49]

166.    Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has engaged in numerous in-game virtual collaborations with child-friendly entities such as Disney, LEGO, Marvel, NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League,

---

[47] Sunil Gill, *Fortnite Revenue, Player Count & Net Worth 2024*, Priori Data (Apr. 1, 2024), https://prioridata.com/data/fortnite-statistics/.

[48] *What is the Battle Pass? Where Can I Learn More?*, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the-battle-pass-where-can-i-learn-more-a000084706 (last visited July 24, 2025).

[49] National Research Group, *Fortnite: The New Social Media?* (June 4, 2019), *available at* https://assets.ctfassets.net/0o6s67aqvwnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856bab6 8e3908bb/NRG_Fortnite_White_Paper.pdf.

Ghostbusters, Star Wars, TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, Naomi Osaka, Indiana Jones, Dragon Ball, Spiderman, Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[50]

167.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 13. Many young children watch Disney movies, play with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and intentionally marketing its Fortnite games to young children by collaborating with the above entities.

168.    Not only does Epic Games engage in in-game collaborations, but it also has physical merchandise it produces or sponsors, most of which are toys or children's items. For example, Epic Games creates Fortnite themed plastic toy loot boxes and battle boxes, action figures, NERF guns, trading cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Epic Games has partnered with children's toymakers like Hasbro to create some of these items.

169.    Epic Games knows that young children play Fortnite.

170.    Epic Games organizes its advertisement and collaboration strategies around the interests of young children. And in 2024, Epic Games's projected annual revenue is $5.8 billion.[51] As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that $5.8 billion from young children and their families, while its partnerships further encourage children under 13 to keep using its Products.

C.    **Fortnite was Designed with Intentionally Addictive Features**

171.    Epic Games knows that minors and those who are susceptible to addiction are using its Product, but nonetheless chose to add features to its Product to intentionally addict such users.

---

[50] Josh Taylor, *Every Single Fortnite Collab & Crossover in Battle Royale's History*, Dexerto (Aug. 26, 2024), https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history-1645672/.

[51] Josh Howarth, *Fortnite User and Growth Stats 2024*, Exploding Topics (Jul. 22, 2024), https://explodingtopics.com/blog/fortnite-stats.

172.    Epic Games actively employs or has employed psychologists and behavioral experts within its User Experiences department and Online department.[52]

173.    Upon information and belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

174.    Epic Games utilizes countless strategies to intentionally maximize the likelihood of addiction of its users. For example, Epic Games designed an achievement system within Fortnite that rewards users for completing various tasks or actions. One such achievement is earned when a user saves 10,000 survivors in successful missions. Another such achievement is unlocked when a user completes 1,000 missions. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. Many achievements are difficult to obtain and require hundreds of hours of gameplay to unlock. This system is designed to keep users engaged with the game, incentivize long periods of gaming over many days, and ultimately increase Epic Games' profits.

175.    Likewise, as noted above, Epic Games designed a Battle Pass system that is designed to encourage players to continually play in order to earn various time-limited in-game rewards and cosmetics by obtaining points through the completion of increasingly difficult challenges across repeated hours and sessions of gameplay or by spending real-world money through V-Bucks.

176.    These addictive features found within Fortnite are intentionally designed and placed within the game to encourage continued and compulsive use, furthering user addiction.

**D.    Epic Games Deceptively Promises Safety and Educational Value in Fortnite**

---

[52] *See, e.g.*, Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited July 24, 2025); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited July 24, 2025); *Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games)*, NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology-and-user-experience-dr-celia-hodent-epic-games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited July 24, 2025).

177.   Epic Games assures users that it wants its Product to be a "safe . . . place for [users] to play games."[53]

178.   Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its Product. Instead, Epic Games touts Fortnite as "educational" and markets it for use in the classroom.

179.   On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[54]



180.   Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating it wants to "support [FOSI's] work to keep kids safe online." Epic Games's Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[55]

181.   Despite assurances of safety, the addictive properties and design features, as alleged herein, of Fortnite are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning

---

[53] *Epic Games: Community Rules*, Epic Games, https://www.epicgames.com/site/en-US/community-rules (last visited July 24, 2025).
[54] *Education*, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative (last visited Apr. 8, 2025).
[55] *Epic Games Joins the Family Online Safety Institute*, FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

about Fortnite addiction.[56] Many health experts have concluded that Fortnite can be as addictive as heroin and other illegal drugs.[57]

182.    Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into Fortnite, and has failed to protect minor users using its Product. While Fortnite does feature some parental controls, they are grossly deficient. Although minor accounts automatically restrict some in-game communication, there is no age verification process. If a minor who is under 13 wants to sign up with a fictitious birth date, they can, and can play Fortnite without the restrictions of an account where the user represents they are under 13.

183.    Fortnite could, but chooses not to, require express parental consent for minors under 13 to create an account. If a minor under 13 creates an account, they can still access most game content and purchase items.

184.    Fortnite imposes a daily spending limit on minors under 13, however, that limit is $100 per *day*.[58] A minor under 13 could spend $36,500 on Fortnite in a year without any parental consent or permission.

185.    While Fortnite imposes *some* automatic restrictions on minor's accounts if the user is under 13, the parental controls and restrictions can only be accessed via the minor's account. To engage with/change any parental control settings, the parent must first know that the account exists, and subsequently know the log in information of their minor.

186.    Epic Games does not provide parental controls regarding screen time, gameplay, and/or usage. Epic Games could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Epic Games also could, but does not, allow users to set self-imposed time limits on their Fortnite account.

---

[56] Rachel Ehmke, *A Parent's Guide to Dealing With Fortnite*, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).

[57] *Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin*, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be-addictive-as-heroin/.

[58] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en-US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players-under-13-a000085524 (last visited July 24, 2025).

187.    At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the excessive use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

188.    During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

189.    Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the Product more and more.

190.    The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a Product that was as addictive as possible.

191.    Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite.

192.    Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games's revenue through continued use of Fortnite by young users, at the expense of these users' mental and physical health.

193.    Epic Games knew that its Fortnite Product contained an inherent risk of abuse, addiction and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

194.    The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Epic Games designing Fortnite with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or

neurodivergent person) and to create addictive engagement, despite Epic Games' knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff C.J., suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Epic Games marketed and misrepresented Fortnite as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

**VIII.   Minecraft**

**A.   <u>Mojang and Microsoft Design, Develop, and Market Minecraft</u>**

195.   Minecraft was first developed and released by Mojang in November 2011.

196.   In September 2014, Microsoft acquired Mojang and its intellectual property (including Minecraft).

197.   After its acquisition of Mojang, Microsoft has been directly and actively involved with Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising, promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has overseen over 125 updates to Minecraft.

198.   To date, over 300 million copies of Minecraft have been sold,[59] and the game averages around 200 million players per month.[60]

**B.   <u>Minecraft Gameplay Basics</u>**

199.   Minecraft is a 3D sandbox game that can be played on a PC, various gaming consoles including Xbox, and mobile devices.

200.   Minecraft's visual design is simple, using blocky, pixelated graphics, and basic colors.

---

[59] Britney Nguyen, *Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It*, Forbes (Oct. 16, 2023), https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-sales-heres-the-only-video-game-still-beating-it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this%20weekend..

[60] Spencer Whitworth, *Minecraft Live Player Count (September 2024)*, Sportskeeda (Apr. 1, 2025), https://www.sportskeeda.com/minecraft/minecraft-live-player-count.

201.    The game itself is easy for users to learn and understand. Gameplay involves the user's character collecting resources, exploring the Minecraft world, crafting items, and trying to survive. The Minecraft world is virtually infinite and is generated based on the user's exploration.

202.    There are multiple game modes, including survival mode and creative mode. Users in survival mode must gather resources to build structures and maintain their health while avoiding attacks from monsters known as "mobs." Users in creative mode have access to unlimited resources they can use to craft items or create structures. Within the creative game mode, the user cannot get hurt by attacking "mobs." Each game mode offers slightly different building abilities and access to resources.

203.    Minecraft users are encouraged to join different "worlds," which can include multiplayer or single-player worlds depending on what kind of world the user enters. To generate a world to play in, users utilize "seeds" which are essentially computer codes. Once a player enters a seed, the code creates a world for the user to explore. The seed shapes the landscape of the world.

204.    The exact structures of most worlds are unique to that world, but worlds created with the same seed will be identical. Users can share seeds with friends so the friends can create the same world using that seed.

205.    Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world.

206.    There are different versions of Minecraft available for play depending on the platform used. The original version of Minecraft, now called "Minecraft Java," is available for play on a PC. The most popular version of Minecraft, and the version available on most platforms, is called "Minecraft Bedrock." Minecraft Java and Minecraft Bedrock are similar; however, the Bedrock version is still currently updated and has additional features that Minecraft Java does not have.

207.    In order to play Minecraft, users must purchase the game and create a Minecraft account.

208.    To create a Minecraft account, users must input a pre-existing Microsoft account, or create a Microsoft account, and choose a password. Users of any age can create a Minecraft account. There is no age verification upon sign-up on the Minecraft website.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

209.    Minecraft has its own form of currency called "Minecoins." One Minecoin is worth less than one US dollar. Minecoins can only be purchased with real currency.

210.    Minecoins can be used to purchase various in-game features such as new skins for the user's avatar, "texture packs" that change the appearance of building blocks within the game, "mash-up packs" that allow users to enter themed worlds with special textures and skins, mini games, and access to new adventures via adventure maps.[61]

211.    In addition to the base game, users can purchase a "Marketplace Pass" for $3.99 per month. The Pass allows subscribers to "[p]lay 150+ pieces of exciting content,…dive into worlds, mash-ups, skins packs, texture packs, and more." New content is added every month to the Pass.[62]

212.    Users can also purchase a "Realms Subscription" which allows them to run their own Minecraft server and share their Marketplace Pass items with up to 10 friends. A Realms Subscription starts at $3.99 per month.

213.    In 2024, Minecraft brought Microsoft and Mojang approximately $220 million in revenue.[63]

**C.    Minecraft Markets to Young Children to Increase Profits**

214.    Minecraft is rated as safe for children 10 and older by the Entertainment Software Rating Board ("ESRB"), which is the leading game-rating system for games in the United States.

215.    Nonetheless, Microsoft and Mojang know that much of Minecraft's player base is younger than 10.

216.    Studies have shown that approximately 53% of children aged 6 to 8 and 68% of children aged 9 to 12 play Minecraft.[64]

---

[61] *Minecraft Marketplace*, Minecraft, https://www.minecraft.net/en-us/marketplace (last visited July 24, 2025).
[62] *Minecraft Marketplace Pass*, Minecraft, https://www.minecraft.net/en-us/marketplace/marketplace-pass (last visited July 24, 2025).
[63] David Curry, *Minecraft Revenue and Usage Statistics (2024)*, Bus. of Apps (Jan. 10, 2024), https://www.businessofapps.com/data/minecraft-statistics/.
[64] Jane Mavoa & Marcus Carter, *Minecraft Teaches Kids About Tech, But There's A Gender Imbalance At Play*, The Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.

217.    Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual and physical product collaborations with child-friendly entities such as LEGO, Avengers, Guardians of the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash Bros., The Incredibles, Angry Birds, Frozen, Ice Age, Sponge Bob Square Pants, Toy Story, Minions, Power Rangers, Fortnite, and more.[65]

218.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 10. Many young children watch Disney movies or play with LEGOs or Hot Wheels. Microsoft and Mojang explicitly and intentionally market Minecraft to young children by collaborating with the above entities.

219.    In addition to virtual collaborations, Microsoft and Mojang also have physical Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For example, Microsoft and Mojang have created a kids educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

220.    Microsoft and Mojang organize their advertisement and collaboration strategies around the interests of young children and make a significant portion of their revenue from young children and their families.

**D.    Microsoft and Mojang Deceptively Promise Safety and Educational Value in Minecraft**

221.    Microsoft and Mojang do not inform users of the inherent risk of addiction involved with using and playing Minecraft or that the Product was designed to make users play more to their potential harm.

222.    Instead, Minecraft's website provides users, potential users, and guardians with false assurances of safety. For example, Microsoft and Mojang state that:

---

[65] *Category: Collaborations*, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations (last visited July 24, 2025).

a.    they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[66]

b.    it is "so important that [their] games are a safe and welcoming place for all players."[67]

c.    "player safety is a priority for Mojang to ensure everyone feels safe."[68]

d.    their "community standards help [them] build a community that is open and safe for everyone."[69]

223.    Minecraft does feature some parental controls, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

224.    Microsoft and Mojang could, but choose not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

225.    Guardians can access parental controls to change the automatic restrictions set by Microsoft and Mojang if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To engage with/change any parental control settings, the parent must first know the account exists, and subsequently know the gamertag information to link their account to their minor's account.

226.    Microsoft and Mojang do not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft and Mojang could, but choose not to, allow parents

---

[66] *Minecraft Help Center – General Safety*, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited July 24, 2025).
[67] *Id.*
[68] *Community Standards for Minecraft*, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited July 24, 2025).
[69] *Minecraft End(er)-User License Agreement ("EULA")*, Minecraft, https://www.minecraft.net/en-us/eula (last visited Apr. 8, 2025).

to set time limits on their minor's Minecraft account. Microsoft and Mojang also could, but do not, allow any users to set self-imposed time limits on their Minecraft account.

227.    At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from excessive use of Microsoft and Mojang's Product. Users, or those linked to a minor's account as the user's guardian, are not provided with information regarding potential physical and mental harm associated with gameplay.

228.    During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Microsoft and Mojang's Product. Users, or those linked to a minor's account as the user's guardian, are not provided with information regarding potential physical and mental harm associated with gameplay.

229.    Microsoft and Mojang do not inform users of the inherent risks involved with using Minecraft, specifically excluding that Minecraft was designed to addict users to their extreme harm and detriment.

230.    Microsoft and Mojang do not disclose to the public or users of Minecraft any of the psychological tactics or addictive features they purposefully incorporate into their Product. Instead, Microsoft and Mojang tout their Minecraft game as educational and have developed Minecraft: Education Edition for use in the classroom.

231.    Minecraft: Education Edition ("Minecraft Education") is a game-based learning platform. Minecraft Education uses the Minecraft graphics with "features built specifically for learning environments." It includes over "600 standards-aligned lessons,"[70] and includes coursework across various subjects.[71]

---

[70] *What is Minecraft Education?*, Minecraft Education,  https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited July 24, 2025).

[71] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited July 24, 2025).

232.    Though Minecraft's age-rating is for children 10 and older, Minecraft Education has lesson plans for children as young as 5[72], and encourages school leaders, educators, and parents to use Minecraft. Minecraft Education provides resources so educators can "learn to teach with Minecraft."[73]



233.    The use of Minecraft Education introduces children to the game that are years younger than Minecraft's age rating.

**E.    Minecraft was Designed with Intentionally Addictive Features**

234.    Microsoft and Mojang know that minors and those who are susceptible to addiction are using their Product, but nonetheless chose to add features to Minecraft to intentionally addict such users.

235.    Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists and behavioral experts to work on Minecraft development.

236.    Upon information and belief, Microsoft and Mojang designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

237.    Upon information and belief, Microsoft and Mojang have licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Minecraft Product.

---

[72] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." *Back to School Preview: Make it Minecraft!*, Minecraft Education (Apr. 8, 2025), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft.

[73] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Apr. 8, 2025).

238.    One example of an intentionally addictive feature within Minecraft is a specific in-game reward system known as "advancements" or "achievements" created by Microsoft and Mojang in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

239.    In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[74]



240.    When a user obtains enough XP, they can "level up," meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[75]

241.    In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

242.    Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

---

[74] *Advancement*, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited July 24, 2025).
[75] *How to Earn Experience Points & Level Up in Minecraft*, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

243. This reward system creates addictive engagement and encourages players to continue gameplay.

244. Many items within Minecraft are statistically more or less difficult to find based upon the item's rarity. Upon information and belief, Microsoft and Mojang intentionally include algorithms that randomize the possibility of finding specific items within the game, and can adjust those algorithms at any time. Microsoft and Mojang can and do manipulate the odds that a user will be able to locate a desired item, thereby artificially increasing the amount of time a player must spend in-game to obtain that item, regardless of the player's skill level. Microsoft and Mojang use these algorithms and features to make the game more difficult, as players cannot automatically locate many in-game items. This creates further addictive engagement and increases gameplay as players search for what they need.

245. Microsoft and Mojang knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms Microsoft and Mojang marketed and misrepresented Minecraft as "educational" and safe for use by minors.

246. The use of operant conditioning, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff C.J., suffering from impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Microsoft and Mojang marketed and misrepresented Minecraft as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## IX.    Microsoft's Xbox and Xbox Products

### A.    <u>Xbox Product Basics</u>

247.    Xbox is a video gaming brand, owned and operated by Microsoft, which consists of Xbox gaming consoles, as well as online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

248.    Each version of the Xbox console provides users with the ability to play video games using a hard copy of the video game, a digital copy downloaded from the Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass or Cloud Gaming.

249.    Microsoft developed and maintains the Xbox Store – a product-platform through which users can purchase thousands of games to be stored on their console through digital download, and for use with its Xbox consoles.

250.    Though third parties create many of the games available in the Xbox Store, Microsoft profits from all monetary transactions that occur within the store, taking thirty percent of revenue from sales of third-party console games.[76]

251.    Likewise, Microsoft profits from all monetary transactions that occur within the third-party games played on its Xbox Platform.

252.    Microsoft markets the Xbox Store as "safer for the whole family" to use:



---

[76] Tom Warren, *Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming*, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.

253.    Microsoft also touts that:

a.      "Xbox strives to create a safer gaming experience for you and your family."[77]

b.      "[Xbox holds itself] accountable for making our platforms as safe as possible for all players."[78]

c.      "[Xbox] will promote the availability of our safety tools through our platforms, support channels, services, on our websites and in retail stores to reach more players and parents."[79]

254.    The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

255.    Xbox Cloud Gaming or Game Pass is operated by linking a device, either a console, tablet, phone, or computer, to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. Thousands of games are available in the Xbox Cloud Gaming and Xbox Network library, including Roblox, Fortnite, and Minecraft.

**B.      Microsoft Employs a Game-Like Achievement System On Its Platforms that Causes and/or Exacerbates Compulsive Game Use.**

256.    Microsoft knows that games targeted to minors – such as Roblox, Fortnite, and Minecraft – are available on its Xbox Platform. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addict such users.

257.    Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[80]

---

[77]    *Family-Friendly Gaming for Everyone*, Xbox, https://www.xbox.com/en-US/family-hub#:~:text=FAMILY%2DFRIENDLY%20GAMING%20FOR%20EVERYONE&text=Xbox%20strives%20to%20create%20a,Windows%2C%20and%20Xbox%20mobile%20apps (last visited July 24, 2025).

[78]Dave McCarthy, *Our Shared Commitment to Safer Gaming*, Xbox, Dec. 14, 2020, https://www.xbox.com/en-US/family-hub/safety-principles.

[79] *Id.*

[80] *See* Deborah Hendersen, LINKEDIN, https://www.linkedin.com/in/deborahjohendersen (last visited July 24, 2025); Todd Kelley, LINKEDIN, https://www.linkedin.com/in/toddakelley (last

258.    Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed and implemented design features to keep users compulsively and addictively engaged with its platform, despite its knowledge that abuse, addiction, and compulsive use by minors can lead to impacts on brain function and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

259.    For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system ("Xbox achievements" or "achievements"). Xbox achievements is a game-like program that tracks the amount of time a player spends in games on the Xbox platform and the player's actions within those games.

260.    Microsoft encourages game developers to use its achievement system by creating tasks for players to accomplish within their respective games.

261.    Microsoft makes available to all users the achievements that are available within the games they are playing.

262.    Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days. Likewise, Roblox achievements include "Marathon" for playing Roblox for an hour, "3 Day Roll" for playing Roblox three days in a row, "10 Day Roll" for playing Roblox ten days in a row, and "20 Day Roll" for playing Roblox 20 days in a row. Similarly, Fortnite includes the "Talented Builder" achievement for building 500,000 structures within the game.

263.    Within each user's Xbox profile, an "achievements" tab displays each game where the user has obtained an achievement. Within the achievements tab, each game shows the percentage of other players who have unlocked the same achievement, and the date it was unlocked:

---

visited July 24, 2025); Carolina Labbé, LINKEDIN, https://cl.linkedin.com/in/carolinalabbe (last visited       July       24,       2025);       Emily       Joseph,       LINKEDIN, https://www.linkedin.com/in/emilymjoseph1?trk=public_post_feed-actor-name (last July 24, 2025).



264.    If a user has their Xbox Platform on, but fails to engage with it for a length of time, Microsoft displays a screensaver that highlights a user's progress in unlocking achievements within a third-party's game.

265.    When these achievements are earned, *Microsoft* – not the third-party games – notifies the player with a console based – not game based – message. This console-based message is akin to the lights and sounds of a slot machine in a casino. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment:



266.    Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen in-game indicates that the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

267.    In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

268.     While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft's purpose for implementing Xbox achievements goes beyond the social aspects of gaming. Rather, Microsoft created the Xbox achievement system in order to incentivize extended and continued gameplay on its platform, resulting in more purchases of in-game or of third-party games, all of which increase Microsoft's profits.

269.     Microsoft's Platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during usage. Users are not provided with information regarding potential physical and mental harm associated with the use of its platform.

270.     Microsoft could, but chooses not to, provide warnings about the harms of use of its platform without any changes to the achievement system or the content of the achievements.

271.     Microsoft could, but chooses not to, implement user protections or safeguards, such as user-imposed time limits on gameplay, increased age verification at account setup, and automatic parental controls imposed when a minor creates an Xbox account.

**C.     Microsoft's Xbox Products Do Not Include Adequate Parental Controls**

272.     To make an Xbox profile, users must first create a Microsoft account, or link to a pre-existing Microsoft account.

273.     If a user already has a Microsoft account, no age verification is required to create an Xbox profile.

274.     Most parental controls are not automatically applied to a minor's Xbox profile upon creation. A parent or guardian can only implement parental controls by accessing the console itself and adjusting settings to apply controls, by logging into the Xbox profile wherein they want to impose parental controls, or by connecting their child's account to their own Microsoft profile. To engage with/change any parental control settings, the parent must first know the account exists, and subsequently know the child's gamertag information to implement controls on their minor's account.

275.     Microsoft could, but chooses not to, automatically implement all parental controls on minors' Xbox profiles upon creation.

The use of operant conditioning, a lack of warnings about the harms of use, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft designing Xbox Products with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft's knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff C.J., suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Microsoft marketed and misrepresented Xbox Products as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## PLAINTIFF-SPECIFIC ALLEGATIONS

276.     Plaintiff C.J. is a thirteen-year-old minor who is addicted to video games as a result of their use of Roblox, Fortnite, and Minecraft.

277.     Plaintiff C.J. began playing Roblox at age seven, Fortnite at age eight, and Minecraft at age six.

278.     Shortly after Plaintiff C.J. began playing Roblox, Fortnite, and Minecraft, as a result of the addictive design of the game, Plaintiff C.J. quickly became addicted to playing video games.

279.    During their years of gaming, Plaintiff C.J. purchased Robux, V-Bucks, and Minecoins to utilize on their respective platforms.

280.    Because of their addiction that was caused by Roblox, Fortnite, and Minecraft, Plaintiff C.J. cannot control the amount they play or spend in video games. On school days, Plaintiff C.J. spends an average of approximately four hours or more playing video games. On non-school days, Plaintiff C.J. spends an average of approximately 12 hours or more playing video games. The majority of time that Plaintiff C.J. is not in school, they play video games, including Defendants' games. On average, Plaintiff C.J. spends more time playing video games than engaging in any other activity, including going to school, spending time with family members, exercising, or engaging in other hobbies because Plaintiff C.J. is addicted to playing video games and must continue to play in order to avoid withdrawal symptoms.

281.    As a result of their gaming addiction, Plaintiff C.J. has experienced severe emotional distress, diminished social interaction, lack of interest in hobbies, academic decline, withdrawal symptoms, and an inability to stop gaming among other injuries. Plaintiff C.J. was previously diagnosed with Attention-Deficit/Hyperactive Disorder ("ADHD") and anxiety that exacerbate the effects of Plaintiff C.J.'s addiction.

282.    Plaintiff C.J.'s gaming addiction is a substantial factor in the decline of Plaintiff C.J.'s academic performance.

283.    Plaintiff C.J.'s gaming addiction is a substantial factor in the necessity of Plaintiff C.J.'s care that includes diagnostic testing and an Individualized Education Plan ("IEP") at school.

284.    Plaintiff C.J.'s usage of Defendant's Product is compulsive and disordered, and they are incapable of restraining their own usage, as are the people around them. Any attempt to remove Plaintiff C.J. from their games, including Roblox, Fortnite, and Minecraft, is met with severe withdrawal symptoms including anger, injurious behavior to themself and others, threats of self-harm, property damage, and refusal to maintain hygiene or sleep.

285.    Plaintiff C.J. has been injured and harmed as a direct and proximate result of each Defendant's actions and misconduct, and for that they are entitled to compensation and other damages.

286.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that damaged and continues to harm Plaintiff C.J. and countless other Americans. For this, they should be punished, and punitive damages should be assessed against each Defendant for its misdeeds and unlawful conduct.

287.    Plaintiff C.J. never agreed to be harmed or exposed to an addictive Product. Plaintiff C.J. also never entered into a contract with Defendant, and/or to the extent that Defendant claims a contract exists with C.J., C.J. expressly disaffirms said alleged contract.

**PLAINTIFF'S CLAIMS**

**COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT**

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

288.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully here.

289.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, and/or otherwise distributing its video game Product used by Plaintiff C.J., which is defective and unreasonably dangerous.

290.    The video game Products that each Defendant placed into the stream of commerce was defectively designed. The Products were designed to cause addictive and compulsive use, including for minors. The Products are not reasonably fit, suitable, or safe for its intended purpose.

291.    The defective conditions of Roblox, Fortnite, and Minecraft rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendant's designs.

292.    The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

293.    Roblox, Fortnite, and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in

this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

294. Each Defendant designed its Products to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

295. Each Defendant's respective Products were expected to and did reach Plaintiff C.J. without substantial change in the condition in which it was designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

296. Plaintiff C.J. used Defendants' Product, Roblox, Fortnite, and Minecraft, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use. Defendants' Products reached C.J. without substantial change to them.

297. Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including Plaintiff C.J., would use the Products without anyone inspecting the Products for addictive or other dangerous features.

298. Each Defendant's respective defective Products were the direct and proximate cause of Plaintiff C.J.'s injuries and harm that include, but are not limited to, emotional distress, diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts for Plaintiff C.J., and injuries and damages as a result.

299. Reasonable users of Defendants' Products would not expect, and Plaintiff C.J. herein did not expect, that said Product would pose risks of severe physical and mental harm.

300. Reasonable users of Defendants' Products would not expect that Defendant knew about risks of severe physical and mental harm and nevertheless chose to place its Product into the stream of commerce.

301. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing their respective Products without the harm-causing features listed above, while still providing an optimal gaming experience.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

302.    At the time each Defendant's Products were designed, developed, distributed to Plaintiff C.J., and played, safer alternative designs existed that were entirely feasible.

303.    Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize and reduce harm caused by their respective Products by implementing elements that include, but are not limited to:

      a.    Robust age verification;

      b.    Effective parental controls;

      c.    The removal of barriers to the enactment of parental controls;

      d.    Warnings of health effects of use and extended use upon sign-up;

      e.    Opt-in restrictions to the length and frequency of sessions;

      f.    Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

      g.    Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

      h.    Self-imposed limits for microtransactions; and

      i.    Others as set forth herein.

304.    Instead, each Defendant designed their Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

305.    Plaintiff C.J.'s injuries—physical, emotional, and economic—were reasonably foreseeable to each Defendant at the time of their Products' design, marketing, distribution, and operation.

306.    Plaintiff C.J. was injured as a direct and proximate result of each Defendant's placement of their respective Products into the stream of commerce, Plaintiff C.J.'s use of the games as intended and designed, and the Products' defective design described herein. The defective designs of Roblox, Fortnite, and Minecraft were the proximate cause of Plaintiff C.J.'s harm.

307.    As a direct and proximate result of each Defendant's defective Products, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such

harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

308.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## <u>COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN</u>

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

309.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

310.    At all relevant times, each Defendant designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff C.J. used.

311.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff C.J. would not have realized the potential risks of the Products. Roblox, Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

312.    Defendants knew, or should have known, that the use of Roblox, Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff C.J. in a reasonably foreseeable manner.

313.    Defendants knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

314.    Defendants owed a duty to warn consumers of the foreseeable risks and dangers of the Products that the Defendants knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

315.    Upon information and belief, Defendants failed to include a warning or an instruction regarding the herein identified risks and dangers of using Defendants' Products, including risks posed to minors who use the Products, in their intended and foreseeable manner.

316.    None of each Defendant's respective Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors.

317.    Defendants' Products did not contain a warning when the Products left their possession

318.    Each Defendant breached their duty of care to provide timely and adequate warnings, instructions, and information, at least in the following circumstances:

    a.    failing to ensure the Products included warnings regarding its addictive design that was accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with its use;

    b.    failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

    c.    failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

    d.    failed to issue warnings to consumers regarding the dangerous risks of the Product even after the sale and/or download of its Products; and

    e.    representing that the Products were and are safe for use, when in fact, the Defendants knew or should have known that said Products were designed to cause minors to overplay them until they developed an addiction or disordered compulsion to use the Products, and as such are and were unreasonably dangerous for use when operated as was foreseeable and intended by the Defendants.

319.     Moreover, each Defendant breached its respective duty of care owed to Plaintiff C.J. through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products. Those breaches include:

a.   utilizing information to design the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

b.   failing to implement effective parental controls;

c.   failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.   failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and

e.   failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

320.     The failure of each Defendant to adequately warn about their defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

321.     A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff C.J. of the dangers.

322.     Had Plaintiff C.J. and/or Charles Johnson been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Charles Johnson would not have allowed Plaintiff C.J. to use or continue to use each Defendant's respective Products. Likewise, Plaintiff C.J. would not have used or continued to use each Defendant's respective Products. Alternatively, if Defendants had

adequately warned or instructed Plaintiff C.J.'s guardian and/or Plaintiff C.J., they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

323.    Plaintiff C.J. was injured as a direct and proximate cause of each Defendant's failure to warn about their respective Products. Plaintiff would not have used the Products had they been aware that the Products could cause stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

324.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

325.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## <u>COUNT III – NEGLIGENCE – DESIGN</u>

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

326.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

327.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff C.J. used.

328.    Defendants knew, or should have known, that the use of Roblox, Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff C.J. in a reasonably foreseeable manner.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

329.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff C.J. would not have realized the potential risks and dangers of Roblox, Fortnite, and Minecraft. By design, Roblox, Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

330.    Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

331.    Roblox, Fortnite, and Minecraft, as designed, was unreasonably dangerous, posed a substantial likelihood of harm, and was therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

332.    Each Defendant breached their duty by failing to use reasonable care in the design of their respective Products by negligently designing Roblox, Fortnite, and Minecraft to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the Products.

333.    Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their respective Products less addictive and harmful to minors, including but not limited to:

     a.  Robust age verification;

     b.  Effective parental controls;

     c.  The removal of barriers to the enactment of parental controls;

     d.  Warnings of health effects of use and extended use upon sign-up;

     e.  Opt-in restrictions to the length and frequency of sessions;

     f.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

g.  Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h.  Self-imposed limits for microtransactions; and

i.  Others as set forth herein.

334.  Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead, each Defendant designed their Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing

335.  A reasonable company under the same or similar circumstances would have designed a safer product.

336.  As a direct and proximate result of each Defendant's negligence, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

337.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IV – NEGLIGENCE – FAILURE TO WARN

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as a manufacturer of Minecraft, and DOES 1-50)**

338.  Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

339.  At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff C.J. used.

340.    Defendants knew, or should have known, that the use of their respective Products was dangerous, harmful, and injurious when used by Plaintiff C.J. in a reasonably foreseeable manner.

341.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to youth. These risks were known and knowable considering each Defendant's internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to Plaintiff C.J.

342.    Each Defendant knew, or should have known, that ordinary consumers such as Plaintiff C.J. would not have realized the potential risks and dangers of Defendants' respective Products. Roblox, Fortnite, and Minecraft are highly addictive and likely to cause mental and physical injuries as listed above.

343.    None of Defendant's Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors. Defendants' Products did not contain a warning when the Products left their possession.

344.    Had Plaintiff C.J. and/or Charles Johnson been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Charles Johnson would not have allowed Plaintiff C.J. to use or continue to use Defendant's respective Product. Likewise, Plaintiff C.J. would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff C.J. and/or Charles Johnson, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

345.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

346.     Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries.

347.     A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

348.     As a direct and proximate result of Defendants' material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

349.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT V – COMMON LAW NEGLIGENCE

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as developer of Minecraft, and DOES 1-50)**

350.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

351.     Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff C.J.

352.     Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in placing the Products into the stream of commerce.

353.     Defendants' duties include a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users and particularly not so to minor users.

354.    Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

355.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative games and/or platforms.

356.    For their own profit, each Defendant chose not to engage in the development of a safer alternative game and/or platform.

357.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

358.    Defendants' failure to act in developing a safer alternative game and/or platform constitutes a breach of their duty of reasonable care.

359.    Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

360.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including C.J., about how and when, if ever, to safely use their Products.

361.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including C.J., the tools to ensure that their Products are used in a limited and safe manner.

362.    As a result of Defendants' breach of the herein identified duties and resulting negligence, Plaintiff C.J. suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' Products.

363.    Defendants' breach of duty of care to Plaintiff C.J. was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

364.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

365.    Each Defendant's actions and omission as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff C.J. seeks actual and punitive damages according to proof.

**COUNT VI – INTENTIONAL MISREPRESENTATION – FRAUD**

**(Cal. Civ. Code § 1714) (Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as developer of Minecraft, and DOES 1-50)**

366.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

367.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including C.J.

368.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaged in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

369.    Defendants owed a duty to avoid engaging in conduct they knew, or reasonably should have known, would cause injury to their users, including Plaintiff C.J.

370.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative games and/or platforms.

371.    For their own profit, each Defendant chose not to engage in the development of a safer alternative game and/or platform.

372.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

373.    Defendants' failure to act in developing a safer alternative game and/or platform constitutes a breach of their duty of reasonable care.

374.    Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

375.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including C.J., the tools to ensure that their Products are used in a limited and safe manner.

376.    As a result of Defendants' breach of the herein identified duties and resulting negligence, Plaintiff C.J. suffered severe physical and mental harm, as well as economic damages, from Plaintiff C.J.'s use of Defendants' Products.

377.    Defendants' breach of duty of care to Plaintiff C.J. was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

378.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

379.    Each Defendant's actions and omission as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff C.J. seeks actual and punitive damages according to proof.

## <u>COUNT VII – INTENTIONAL MISREPRESENTATION</u>

**(Cal. Civ. Code § 1710[1]) (Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as developer of Minecraft, and DOES 1-50)**

380.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

381.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff C.J. used.

382.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

383.    Defendant Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and

compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff C.J.

384.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff C.J.

385.    Defendants Microsoft and Mojang designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and product users, including Plaintiff C.J.

386.    Defendants knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

387.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

388.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff C.J.

389.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" in creating recommendations for its Product.

390.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

391.    Each Defendant intended for users, including Plaintiff C.J., to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

392.    Defendant's statements about the safety of its Product are false and misleading, and Defendant's omission of the potential harm caused by Defendant's Product is misleading and deceitful.

393.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

394.    Defendants failed to disclose to users, including Plaintiff C.J., that their Products are designed to create and sustain addiction.

395.    Defendants intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

396.    Defendants intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

397.    Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew that their Products caused addiction and compulsive use.

398.    Defendants intended for users, including Plaintiff C.J., to rely on their representations that their Products were safe for use in order to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

399.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Charles Johnson would not have allowed C.J. to use each Defendant's Products and Plaintiff C.J. would not have purchased, downloaded, played, continued to use, and/or purchased each Defendant's game content.

400.    Plaintiff C.J. was unaware of Defendants' intentional design and failure to warn about their addictive Products. Plaintiff C.J. reasonably relied on Defendants' representations that their Products were safe for use, particularly for minors.

401.    Plaintiff C.J. reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

402.    A reasonable person, including Plaintiff C.J., would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff C.J. justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

403.    Because of Plaintiff C.J.'s reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

404.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

405.    Each Defendant's actions and omission as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff C.J. seeks actual and punitive damages according to proof.

## COUNT VIII – NEGLIGENT MISREPRESENTATION

### (Cal. Civ. Code § 1710[2]) (Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as developer of Minecraft, and DOES 1-50)

406.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

407.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff C.J. used.

408.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

409.    Defendant Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and

compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff C.J.

410.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff C.J.

411.    Defendants knew of the risks associated with the use of their Products based on internal research and external studies known within the industry.

412.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

413.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff C.J.

414.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" in creating recommendations for its Product.

415.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

416.    Each Defendant intended for users, including Plaintiff C.J., to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

417.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

418.    Defendants failed to disclose to users, including Plaintiff C.J., that their Products are designed to create and sustain addiction.

419.    Defendants failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

420.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

421.    Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew, or reasonably should have known, that their Products caused addiction and compulsive use.

422.    Defendants intended for users, including Plaintiff C.J., to rely on their representations that their Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

423.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Johnson would not have allowed C.J. to use Defendants' Products and Plaintiff C.J. would not have purchased, downloaded, played, continued to use, and/or purchased Defendant's game content.

424.    Plaintiff C.J. was unaware of Defendants' intentional design and failure to warn about their addictive Products. Plaintiff C.J. relied on Defendants' representations that their Products were safe for use, particularly for minors.

425.    Plaintiff C.J. reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

426.    A reasonable person, including Plaintiff C.J., would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff C.J. justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

427.    Because of Plaintiff C.J.'s reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

428.    Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff C.J., who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

## COUNT IX – FRAUD

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, Microsoft in its capacity as developer of Minecraft, and DOES 1-50)**

429.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

430.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and otherwise distributing the Products used by C.J.

431.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

432.    Each Defendant knew their Products posed risks to minors, like C.J., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like C.J., to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' Products.

433.    Defendant Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff C.J.

434.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users, including Plaintiff C.J.

435.    Defendants Microsoft and Mojang designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and product users, including Plaintiff C.J.

436.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

437.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff C.J.

438.    Each Defendant intended for users, including Plaintiff C.J., to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

439.    If Defendants had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Johnson would not have allowed C.J. to use Defendants' Products and would not have purchased, downloaded, played, continued to use, and/or purchased Defendants' game content.

440.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

441.    As a direct and proximate result of each Defendant's material omissions, Plaintiff C.J. had no reason to believe that each of Defendant's Products were unsafe for children to use.

442.    Plaintiff C.J. reasonably relied on Defendants' misrepresentations that each of their Products was safe for use.

443.    A reasonable person, including Plaintiff C.J., would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff C.J. justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

444.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff C.J. suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff C.J.'s injuries are permanent and will require more medical care and treatment in the future.

445.    Each Defendant's actions and omission as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff C.J.'s rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT X – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

**(Against Defendants Roblox Corporation, Epic Games, Mojang AB, and Microsoft in its capacity as a developer of Minecraft and DOES 1-50)**

446.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

447.    Defendants are corporations, and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

448.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, et seq., prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

449.    By the conduct described in detail above and incorporated herein, Defendants engaged in unfair and deceptive acts in violation of California's Unfair Competition Law.

450.    Defendants knowingly engaged in the production, design, distribution, and sale of Products to users, including C.J., which were unsafe and addictive, particularly for minors.

451.    Defendants promoted their Products to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Products.

452.    These business practices that Defendants have engaged in are fraudulent and deceptive practices in violation of the UCL.

453.    Defendants' business practices are also unfair in violation of the UCL. Defendants' actions are unethical at minimum, and the benefit of employing their deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff C.J. suffered.

454.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein.

455.    As a direct result of Defendants' conduct, Plaintiff C.J. sustained economic losses, including hundreds of dollars per year in video game related spending. Had Defendants not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

456.    As a result of each Defendant's conduct, Plaintiff C.J. sustained significant injuries.

457.    As such, in accordance with the provisions of the California Business and Professions Code §§ 17200 and 17203, Plaintiff requests that this Court enjoin each Defendant from continuing to violate the UCL or violating it in the same fashion in the future, and from continuing to conduct business via the unfair and fraudulent business acts as set forth in this Complaint.

## COUNT XI – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against Defendant Microsoft in its capacity as a developer of Xbox Products)

458.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully here.

459.    At all relevant times, Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the Xbox Products used by Plaintiff C.J., which are defective and unreasonably dangerous.

460.    The Products the Defendant placed into the stream of commerce were defectively designed. The Products were designed to facilitate the purchase and use of addictive video game products. The Products are not reasonably fit, suitable, or safe for their intended purpose.

461.    The defective conditions of Xbox Products rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendant's design.

462.    Defendant's defective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

463.    Defendant's Products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, the creation of Products that do not contain warnings about the potential harm of use, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper minor age verification, and because the Products created failed to operate as a reasonable user would expect.

464.    Defendant's Products were expected to and did reach Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

465.    Plaintiff C.J. used Defendant's Products in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

466.    Defendant's defective Products in fact and proximately caused emotional distress, diminished social interactions, lack of interest in other hobbies and sports, withdrawal symptoms such as rage, anger, and physical outbursts for Plaintiff C.J. and injuries and damages as a result.

467.    Plaintiff C.J. used Defendant's Products as intended and as reasonably foreseeable, and Defendant knew or, by the exercise of reasonable care, should have known that minors, including Plaintiff C.J. would use the Products without anyone inspecting the Products for dangerous features.

468.    Reasonable users of Defendant's Products would not expect, and Plaintiff herein did not expect, that said Products would pose risks of severe physical and mental harm.

469.    Reasonable users of Defendant's Products would not expect that Defendant knew about risks of severe physical and mental harm and nevertheless chose to place their Products into the stream of commerce.

470.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing Products without the harm causing features listed above while still providing an optimal gaming experience.

471.    An alternative safer design of the Defendant's Products, at the time of their design, development, and distribution, was and is entirely feasible.

472.    Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm, including, but not limited to:

     a.    Robust age verification;

     b.    Effective parental controls;

     c.    Removing barriers to the enactment of parental controls;

     d.    Warning of health effects of use and extended use upon sign-up;

     e.    Default protective limits to the length and frequency of sessions;

     f.    Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

     g.    Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night); and

     h.    Others as set forth herein.

473.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth.

Instead, Defendant designed Products that increase addictiveness, use time, frequency of use, and engagement with the Products.

474.    A reasonable company under the same or similar circumstances would have designed a safer product.

475.    Plaintiff was harmed directly and proximately by the Defendant's failure to use reasonable care in the design of its Products.

476.    The design of Defendant's Products was a proximate cause of Plaintiff's harm.

477.    Plaintiff seeks actual and punitive damages according to proof.

## COUNT XII – STRICT PRODCUT LIABILITY – FAILURE TO WARN

**(Against Defendant Microsoft in its capacity as a developer of Xbox Products)**

478.    Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

479.    At all relevant times, Defendant designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products that Plaintiff used.

480.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the Products. Defendant's Products are harmful and likely to cause mental and physical injuries as listed above.

481.    Defendant knew, or should have known, that the use of its Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

482.    Defendant knew that its Products were and are harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

483.    Defendant owed a duty to warn consumers of the foreseeable risks and dangers of the Products that the Defendant knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

484.   Upon information and belief, Defendant failed to include a warning or an instruction regarding the herein identified risks and dangers of using Defendant's Products, including risks posed to minors who use the Products, in their intended and foreseeable manner.

485.   None of Defendant's Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

486.   Defendant's Products did not contain a warning when the Products left their possession.

487.   Defendant breached its duty of care to provide timely and adequate warnings, instructions, and information, at least in the following circumstances:

    a.   failing to ensure the Products included warnings regarding their harmful design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

    b.   failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users; and

    c.   failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities.

488.   Moreover, the Defendant breached its duty of care owed to Plaintiff through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its Products. Those breaches include:

    a.   failing to implement effective parental controls;

    b.   failing to remove barriers to the enactment of parental controls;

    c.   failing to implement reasonably available means to self-limit or deter excessive frequency or duration of use of Products by minors, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  failing to implement reasonably available means to limit or deter use of Products by minors during ordinary times for school or sleep; and

e.  failing to implement robust age verification.

489.  The failure of Defendant to adequately warn about its defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

490.  A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff of the dangers.

491.  Had Plaintiff and/or Plaintiff's guardian received adequate warning about the risks of Defendant's Products, Plaintiff and/or Plaintiff's guardian would have heeded such warnings

492.  Plaintiff was injured as a direct and proximate cause of Defendant's failure to warn about their Products. Plaintiff would not have used the Products had they been aware that the Products could cause stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

493.  Defendant's failure to warn Plaintiff of the risks inherent in its Products was a proximate cause of and a substantial contributing factor to Plaintiff C.J.'s injuries.

494.  Plaintiff seeks actual and punitive damages according to proof.

**COUNT XIII – NEGLIGENCE – DESIGN**

**(Against Defendant Microsoft in its capacity as a developer of Xbox Products)**

495.  Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

496.  At all relevant times, the Defendant designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products that Plaintiff used.

497.  Defendant knew, or should have known, that the use of its Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

498.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of its Products. Defendant's Products are likely to cause mental and physical injuries as listed above.

499.    Defendant owed a duty to all reasonably foreseeable users to design a safe product.

500.    Defendant's Products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to the creation of Products that do not contain warnings about the potential harm of use, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper minor age verification, and because the Products created failed to operate as a reasonable user would expect.

501.    Defendant breached its duty by failing to use reasonable care in the design of its Products by negligently designing its Products to specifically appeal to minors, who were particularly unable to appreciate the risks of the Products.

502.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that would make the product less harmful to minors, including but not limited to:

      a.   Robust age verification;

      b.   Effective parental controls;

      c.   Removing barriers to the enactment of parental controls;

      d.   Warning of health effects of use and extended use upon sign-up;

      e.   Default protective limits to the length and frequency of sessions;

      f.   Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

      g.   Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night); and

      h.   Others as set forth herein.

503.    Defendant breached its duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth.

Instead, Defendant designed Products that increase addictiveness, use time, frequency of use, and engagement with the Products.

504.    A reasonable company under the same or similar circumstances would have designed a safer product.

505.    Plaintiff was harmed directly and proximately by the Defendant's failure to use reasonable care in the design of their Products.

506.    The design of Defendant's Products was a proximate cause of Plaintiff's harm.

507.    Plaintiff seeks actual and punitive damages according to proof.

### COUNT XIV – NEGLIGENCE – FAILURE TO WARN

**(Against Defendant Microsoft in its capacity as a developer of Xbox Products)**

508.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

509.    At all relevant times, Defendant designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff used.

510.    Defendant knew, or should have known, that the use of Defendant's Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

511.    Defendant knew or, by the exercise of reasonable care should have known, that its Products posed risks of harm to youth. These risks were known and knowable considering Defendant's own internal information and knowledge regarding its Products at the time of the Products' development, design, marketing, promotion, advertising, and distribution to Plaintiff C.J.

512.    Defendant knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendant's Products. Defendant's Products are highly addictive and likely to cause mental and physical injuries as listed above.

513.    None of Defendant's Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm to users, particularly minors particularly minors and individuals with autism and/or ADHD. Defendant's Products did not contain a warning when the Products left their possession.

514.    Had Plaintiff and/or Plaintiff's guardian received adequate warning about the risks of Defendant's Products, Plaintiff and/or Plaintiff's guardian would have heeded such warnings.

515.    Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably foresee.

516.    Defendant breached its duty owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause compulsive use and/or other physical and mental injuries.

517.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

518.    As a direct and proximate result of Defendant's breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

519.    Each Defendant's failure to provide sufficient warnings was a substantial factor in causing harm to Plaintiff.

520.    Plaintiff seeks actual and punitive damages according to proof.

## COUNT XV – NEGLIGENCE

**(Against Defendant Microsoft in its capacity as a developer of Xbox Products)**

521.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

522.    Defendant had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff C.J.

523.    Defendant, in its role as a product designer, developer, manufacturer, marketer, and seller, and otherwise engaging in activity culminating in placing its Products into the stream of commerce, owed a duty to exercise ordinary care in placing the Products into the stream of commerce.

524.    Defendant's duties include a duty to warn users of the hazards of using its Products, which Defendant knew were present in their Products, though such hazards were not obvious to users and particularly not so to minor users.

525.    Defendant's duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

526.    Defendant created harmful Products and failed to engage in the development of safer alternative games and/or platforms.

527.    Defendant chose not to engage in the development of a safer alternative game and/or platform for profit.

528.    Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

529.    Defendant's failure to act in developing a safer alternative game and/or platform constitutes a breach of its duty of reasonable care.

530.    Defendant knows that its Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

531.    Defendant was and is negligent in failing to provide adequate warnings about the dangers associated with using its Products and in failing to warn users, and the parents of users who are minors, including Plaintiff C.J., about how and when, if ever, to safely use its Products.

532.    Defendant was and is negligent in failing to provide users, and their caregivers in the case of users who are minors, including Plaintiff C.J., the tools to ensure that its Products are used in a limited and safe manner.

533.    Defendant chose not to provide warnings about the dangers associated with using its Products and chose not to provide tools and/or safeguards to ensure that its Products are used in a limited and safe manner, because Defendant knew that providing those warnings and safeguards would limit their profits.

534.    As a result of Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendant's Products.

535.    Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

536.    As a direct and proximate result of the Defendant's breach of one of more of the herein identified duties of care owed to Plaintiff, Plaintiff was injured, harmed, and damaged.

537.    Plaintiff seeks actual and punitive damages according to proof.

### **PRAYER**

WHEREFORE, Plaintiff prays for judgment against each Defendant, as appropriate to each and every cause of action alleged and as appropriate to the particular standing of Plaintiff, as follows:

1.    For Plaintiff C.J.'s general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2.    For Plaintiff C.J.'s past and future economic and special damages according to proof at the time of trial;

3.    For Plaintiff C.J.'s medical and related expenses according to proof at the time of trial;

4.    For Plaintiff C.J.'s prejudgment interest according to proof as provided by law;

5.    For Plaintiff C.J.'s costs of suit herein;

6.    For injunctive relief;

7.    For attorneys' fees;

8.    For exemplary and/or punitive damages according to proof at the time of trial; and,

9.    For such other and further relief, whether at law or in equity, that this Court deems just and proper.

Dated: December 1, 2025

**GOMEZ TRIAL ATTORNEYS**

John H. Gomez, Esq. (CA Bar No. 171485)
Joshua R. Harris, Esq. (FL Bar No. 124124)
*(pro hac vice forthcoming)*
755 Front Street
San Diego, CA 92011
Ph: 619-237-3490 / Fax: 619-237-3496
john@getgomez.com
josh@getgomez.com

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**HAIR SHUNNARAH TRIAL ATTORNEYS**
Galen M. Hair, Esq. (LA Bar No. 32865)
*(pro hac vice forthcoming)*
Kyle C. Usner, Esq. (LA Bar No. 38923)
*(pro hac vice forthcoming)*
3001 17th Street
Metairie, LA 70002
Ph: 504-684-5200 / Fax: 504-613-6351
hair@hstalaw.com
kusner@hstalaw.com

***Attorneys for Plaintiff***

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all of their claims so triable.

Dated: December 1, 2025                    **GOMEZ TRIAL ATTORNEYS**

_____
John H. Gomez, Esq. (CA Bar No. 171485)
Joshua R. Harris, Esq. (FL Bar No. 124124)
*(pro hac vice forthcoming)*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

755 Front Street
San Diego, CA 92011
Ph: 619-237-3490 / Fax: 619-237-3496
john@getgomez.com
josh@getgomez.com

**HAIR SHUNNARAH TRIAL ATTORNEYS**
Galen M. Hair, Esq. (LA Bar No. 32865)
*(pro hac vice forthcoming)*
Kyle C. Usner, Esq. (LA Bar No. 38923)
*(pro hac vice forthcoming)*
3001 17th Street
Metairie, LA 70002
Ph: 504-684-5200 / Fax: 504-613-6351
hair@hstalaw.com
kusner@hstalaw.com

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL